Case No. 16-1127, et al. EarthReports, Inc. doing business at the Pembroke River Keeper, et al. Petitioners v. Federal Energy Regulatory Commission. Ms. Goldberg for Petitioner EarthReports, Inc. Ms. Malley for Petitioner BP Energy. Ms. Larson for the Respondent. Ms. Stetson for Intervenor DominionCo.LMGLP and Mr. Norris for Intervenor American Petroleum Industries. Good morning. May it please the Court, my name is Debra Goldberg of EarthJustice, and with my colleague Maneen Naismith, we are here today representing EarthJustice, sorry, EarthReports, doing business at the Pembroke River Keeper, Sierra Club, and also arguing on behalf of the Chesapeake Climate Action Network, which is separately represented by Anne Haberman. In the very limited amount of time I have today, I want to focus on two of our countries. The Federal Energy Regulatory Commission, FERC, violated the National Environmental Policy Act by failing to analyze the significant indirect impacts on water, air, land, and communities in the Marcellus Shale region, which will result from new production of gas needed to feed the Cold Point Project over a period of at least 20 years. The gas production impacts are often known as upstream impacts. The record shows that the project will induce new production of approximately 2.847 trillion cubic feet from the Marcellus Shale. FERC's extremely conservative assumptions in the Constitutional Pipeline proceedings show that as many as 3,000 wells could be required to produce that gas for delivery. Every new well means 5 million gallons of water for hydraulic fracturing and up to 6,000 truck trips through rural communities in the Shale region. Second, FERC violated NEPA by failing to provide a life cycle analysis of the project climate impacts, including upstream impacts, direct construction and operational impacts, and  FERC admits that the greenhouse gas emissions potentially emitted directly from the project will be more than 2 million tons per year, more than all but three of Maryland's largest industrial facilities. When upstream and downstream emissions are counted, the project will cause greenhouse gas emissions greater than those of the entire coal-fired power plant fleet in Maryland. So on your first issue, what do you say to the response of the Division of Responsibility in terms of causation? NEPA does not allow the segmentation of the analysis between the liquefaction facility and the exports. And your cite for that is, the Energy Policy Act of 2005 signs the responsibility for the NEPA review of all federal authorizations to FERC. And the citation for that? What I'm getting at is certain responsibilities have been vested in the Secretary of Energy. Is that correct? That is correct, but not the NEPA responsibilities, Your Honor. And certain other responsibilities have been vested in FERC. Correct, Your Honor. So to the extent Energy makes decisions that FERC can't overrule, doesn't that limit FERC's responsibility or at least support its analysis on causation? No, Your Honor. It does not. So even though it has no authority to overrule the Secretary of Energy on exports, it still has the responsibility to do the total analysis? Absolutely, it does, Your Honor. In fact, the Department of Energy has acknowledged that. Well, the Department of Energy has said that FERC may be the lead, but it's reserved for whether to grant the ultimate license on export and the environmental impacts analysis, hasn't it? In the filing of no significant impact that was published by the Department of Energy, it said, all discussion and analysis related to the potential impact of a grant of the export application are contained within the environmental assessment prepared by FERC. The environmental impact assessment for the Coast Point liquefaction project, which is herein adopted and incorporated by reference. So what are you quoting? I'm quoting from the filing of no significant impact. Which I'm afraid is not currently in the record, but I do have copies for the court. Are you going to put those in the record for us? Well, they are. I can put them in the record, Your Honor, but they are government documents of which can take judicial notice. Well, it's difficult for us to take notice of what's not in the record. And don't make license to us. That's all I'm getting at. So if you have it, why don't you make it available to the clerk? I will do so. For putting it in the record. I will do so, Your Honor. But that's the clearest citation. So that is the clearest citation, but what is important to understand is the difference between the separation of the public interest determination and the NEPA analysis. There is a separate determination for public interest, and that's the ultimate approval. But there is a united environmental analysis under NEPA. Certainly, if with a single project under a single ownership in a single location operating over the same period of time, if DOE and FERC had attempted to do separate environmental assessments, one for liquefaction and the other for the export, that surely would be considered to be segmentation under NEPA. That would have been an even more glaring segmentation plan this court found in the Delaware Riverkeeper Network, where we had a long pipeline with multiple segments. Here, it's the very same outfit under the very same company. Now, you didn't win that argument totally in that case. Well, it wasn't my case, Your Honor. Well, the case you just cited. The case that I just cited, it was sent back after finding the segmentation. Right. It wasn't all of the claims, but the segmentation claim was sustained. Right.  There is an indirect impact of liquefaction facility, which is going to liquefy up to a billion cubic feet per day of gas for export. The indirect impacts are those that are caused by the action and are later in time, but still reasonably foreseeable. So, the commission gave an explanation as to why it concluded that the analysis that involved speculation and be unhelpful to the commission in making the decisions it had to make. Yes, Your Honor. But it's far from speculative in this case with respect to the upstream impacts or even the climate impacts of this facility. There are both studies that have been done that show that when there is a new gas demand, there is upstream development, typically of at least 60 to 80 percent, depending upon the particular scenario that's considered. And in our particular situation, we actually have evidence in the record of precisely which producers are going to be delivering gas to Cold Point for liquefaction. So, we know where they drill wells. Is that the contract that's not in the record? The contract is not in the record, Your Honor. It's only a newspaper story. That is correct, but this is a typically privileged document that are not available to petitioners, but are available to FERC. If FERC had any real question about whether or not this was legitimate, it could easily have requested a copy of that contract from... Did you ask FERC to do that? Did your client ask FERC to do that? We did not ask FERC to put the contract into the record. Okay. Whether or not that information would be useful, however, should be clear because it can affect the agency's determination in four different ways. Based on the direct impacts, for example, of the facility and the up and downstream impacts, there's a very good question as to whether the significance determination could be sustained here. We are talking about moving from a situation with 2 million tons of greenhouse gases directed from the facility to 26 million metric tons per year for upstream and downstream impacts. Plainly, an increase of more than 100%, more than 1,000%, ought to affect the significance determination in this case. It also could very well affect whether or not the significant impacts are capable of mitigation. What of the commission's analysis that this particular coal point area, this is not the And the commission was relying on previous environmental analyses and its previous orders allowing certain things to happen at the facility. Why was that impermissible? That is impermissible as to the export facilities because those facilities have never been investigated in this case. This is a flip of an import facility to an export facility. I think what the commission is getting at is to the extent it previously approved the production of, say, X, whatever it is. Now we're under X, even with this new facility. So it's unnecessary in terms of your argument about new production, et cetera. To go further because it's already approved after an environmental impact. I do not believe that FERC is claiming that it has already approved the upstream and downstream impact of this facility or even the direct impact of this facility. It claims to have approved the shipping.  What it claims it has already approved is the use of 200 vessels. Precisely. Right. And they're claiming now that there are only 85 and therefore they may not investigate that any longer. So you're saying there's still gaps in the analysis. There are large gaps in the analysis which would affect the significance determination and the ultimate justification of this facility. So is this a collateral attack on the commission's earlier decision to allow 200 vessels? We are not attacking the approval of 200 vessels, in fact. So it says here there are only 85. Correct. What we are concerned about are the emissions from those vessels which have not been analyzed. So you know that from the previous environmental impact statement? Correct, Your Honor. Because it was an import project. So for the import project, there was never any need to... But I don't understand that argument. If the commission has approved an operation up to 1,000 BTUs and the facility has never operated at that level and now it only wants to operate at 850 BTUs, why isn't its previous decision controlling? Because, Your Honor, it did not make that finding as to the emissions from the liquefaction plant. The liquefaction plant in this case, unlike in some of the other cases that have been before this court, is brand new. So it must evaluate the impacts, the new impacts of the liquefaction facility. And it's the liquefaction facility that is responsible for the production upstream and for the ultimate ability to ship and burn downstream. There is a very big difference in impacts between an import facility which simply receives gas and pipes it out and a liquefaction facility which receives the gas, liquefies it, loads it so that it can be shipped and ultimately burned in India and Japan. And that encompasses your life cycle argument as well? Yes, Your Honor. All right. Do you want to save the rest of your time? Yes, I would. Thank you. All right. May it please the court. Eric Maley, representing Petitioner BP Energy Company. First, BP clearly has standing here because FERC denied its request that it order Dominion liquefy a natural gas terminal. And so we have to accept that it's true that it had that right for purposes of determining whether it had standing? For purposes of determining standing, yes, Your Honor. Of course, the question of whether there was, in fact, an undue discrimination here goes to the merits that BP has alleged that FERC's denial of its request violated its statutory rights under the Natural Gas Act. And that provides it with standing, particularly given that that denial here caused direct economic harm to BP by requiring it to continue to pay for costly and unwanted terminal services. So do you want to go to the merits? Yes, Your Honor. FERC's order here cannot stand because it misinterprets the clear statutory text of the Natural Gas Act. Section 3E4. Oh, you're at a Step 1 argument? Yes, Your Honor. We raised both Step 1 and Step 2 arguments. We believe that FERC's interpretation in the orders below is both contrary to unambiguous text in Section 3E4, and is also an unreasonable and arbitrary and perpetual. What's the unambiguous text in the statute?  No, Your Honor. No, Your Honor. That argument, in fact, wasn't even raised as a basis for the order below, and so is not something this Court should consider in this appeal. Below, FERC held that BP and stat oil were not similarly situated, and therefore need not be treated equivalently on the ground that BP is an open access customer, while stat oil is not. But Section 3E4 clearly prohibits undue discrimination in precisely those circumstances. What's undue? Well, undue discrimination, Your Honor, is if you have two similarly situated customers and there's a significant disparity in their treatment that affects their substantive rights under prior FERC interpretations of the term undue discrimination, that would be undue. And here, that would... It seems that the agency, the Commission, has to have at least some discretion to assess what's undue. There's discrimination, so there's differential treatment of two similarly situated parties, and the question then becomes, what's undue discrimination? And it's hard, in the abstract, to define a bright line as to what's, for us, I think, as to what's undue and what's not. Yes, of course, Your Honor. It is often a fact-intensive inquiry in which the Commission has significant discretion, but what the Commission actually held here was that BP and stat oil were not similarly situated. But part of that was because the regulatory benefits that flow to an open-access shipper are not available for stat oil. And so, when you take the package of benefits on the one hand that are available and consider this turned back on the other, you know, you kind of balance. They're not apples and apples, but you try to balance that and determine that it's not undue discrimination. What's wrong with doing it that way? Well, there were at least two things wrong with the Commission's analysis below in that respect. And first of all, it didn't explain why it considered those regulatory rights to be relevant to a turned back. And they're not, in fact, relevant to a turned back. The right to extend one's contract is, in fact, the exact opposite of a turned back right, and they're not going to be... But that was something available to BP and not available for... Well, that is the second issue with their analysis, Your Honor, is that they didn't, in fact, do an analysis of whether it is available to stat oil. And there are... Because they didn't look at the contrast? Yes, Your Honor, and they didn't inquire as to that. And there are, in fact, indications in the record that under those proprietary contracts, stat oil does have both contract extension rights and release rights. Dominion has represented that to the Commission at various points, including back in the 2006 order when this contract was initially approved. And so at the very least, before concluding that those are a basis for finding BP and the Commission should have conducted an analysis of whether stat oil actually had equivalent rights. Now, I know you're going to say this isn't discussed below, and that's a separate issue, and I understand that, and we'll deal with that. But I just want to go on the statutory language. Terms or conditions of service at the facility as all of those terms are defined by the Commission. That's an unusual tail phrase there, as all of those terms are defined by the Commission. Doesn't that suggest that the Commission gets to figure out which terms are covered by this provision? Well, as you know, Your Honor, apart from the question that that was not actually the basis of the There's clearly some grant of authority to the Commission to interpret that provision. But at the same time, the Commission's interpretation has to be both within that delegation of authority, and it also has to be a reasonable construction and one that's not arbitrary. They say, okay, this statute gives us discretion to define those terms, and we're going to define it to encompass only operational terms. Yes, Your Honor, and one concern with that, of course, is that's not actually what happened in the order below. They did not define those terms, and they didn't say that they only include operational conditions, and that's under the Shenry doctrine. It's not a basis for upholding that order. Another concern that renders it arbitrary and capricious is that it's an unexplained departure from their prior precedent, in which they've held, for instance, in the Tennessee gas pipeline case. Is that a limitation here, given the tail clause that's in the statute? Congress has clearly told them here, you can go a different way here. That language wouldn't be there if Congress wasn't giving them authority to say something different than they had said before. Well, yes, Your Honor, but they still have the obligation to explain their reasoning and to explain the basis for their decision, and that, of course, was not done in the order below at all. And even in their brief on appeal, they haven't explained why they're departing from their previous holding that turn-back provisions are a term or condition of service, and for that reason have to be offered to all customers on a not unduly discriminatory basis. And they also haven't made an attempt to square that with the purposes of the provision. And as this Court has recognized, the purpose of anti-discrimination provisions in the National Gas Act is to prevent abuses of market power by LNG companies, which are nationally monopolistic. Financially, what's the turn-back agreement do? What's its function? Doesn't it work somewhat similar to rate changes? I mean, it's all about the money that you're getting. How is it different than? Well, what a turn-back provision, Your Honor, does is it's essentially an early termination of the contractual agreement. These are long-term contracts. But why can't it be considered functionally the same way a rate change is considered? It's not functionally the same as a rate change, as this is laid out in the Commission's Tennessee Gas Pipeline Order, because it offers valuable flexibility to shippers to terminate a deal that is no longer economic due to changes in market conditions, which is precisely what occurred in this case. And rate provisions and release provisions aren't a substitute for that, because they don't give a shipper a way to simply end a deal early. And that is what BP has requested here, and that is the opportunity that it has not agreed to. But aren't there different ways of getting at the same thing, and that's saving money for Dominion? It is, of course, ultimately an economic issue, Your Honor. However, if the rate's not going to be zero, then a rate change is not going to be equivalent to an opportunity to simply terminate a contract early. And that is what a turn-back does. But they can charge different rates to existing customers and new customers. Yes, Your Honor. Section 3E4 does not cover rates at all, which is clear if you compare the language with Section 3E3B, which refers to – But isn't it odd to think – I guess this is going to your broader purpose argument – that people think that they can charge different rates, but can't have a turn-back with one customer and not with another? Well, no, Your Honor. What's the logic there? The logic there essentially was at that time, in 2005, there was a concern that the country needed greater imports of liquefied natural gas, because at that time there was not a great deal of domestic production. And the Commission found, and Congress ultimately agreed, that requiring cost-based rates was deterring LNG companies from investing in creating new LNG terminals. And they felt that allowing the companies to charge market-based rates instead was going to encourage more terminals, which would encourage greater production. And that's why there is no provision in the EAP Act. Doesn't your recitation of the history illustrate that we're at an interesting point where we have this intersection, this crossroads between the old way of doing things, Section 7, and the new way of doing things, Section 3? And if I read Section 3, Congress is telling FERC, you have a lot more flexibility here. You have a lot more flexibility to enter into market-based arrangements. And so why shouldn't we look at these sections with that understanding that FERC is supposed to be getting lots of flexibility here, provided the folks under Section 7 aren't disadvantaged in terms of their operations, in terms of operations of service? Well, Your Honor, first of all, as Judge Kavanaugh has mentioned, that's not something the court should consider here because that wasn't the basis of the order below. And that's under the Chenery Doctrine. It should not be considered on appeal. And second of all, as Your Honor noticed, Congress did explicitly, as well, put a provision into the Energy Policy Act to protect those existing customers in the event that you have missed terminals where some customers are locked into agreements. And that's the key to the case, protect them from what? Well, to protect them from several things, Your Honor. It's to protect them from subsidizing the agreements. It's to protect them from having their own service degraded. And it's also to protect them from undue discrimination under the explicit terms of the provision. And the Commission has previously recognized that it is unduly discriminatory to offer contract termination rights to certain customers and not others because that is a valuable right to shippers. What if they offer a turn-back provision to one and a not-as-good turn-back provision to another? Well, Your Honor, that would present a much closer question that would require a detailed factual analysis of, was there any factual basis for drawing the distinction? And even if there wasn't, is it a significant enough distinction to render the discrimination undue? But here you have an instance where that oil was offered a turn-back and BP was simply not offered a turn-back at all. And that is a clear-cut instance, Your Honor, where the rights are very significantly different and it is unduly discriminatory against BP. All right. Why don't we hear from respondents? Good morning. May it please the Court. Karen Larson for the Federal Energy Regulatory Commission. Before I turn to the issues raised by IRF Reports, I'd like to just continue the discussion you just had with BP Energy with respect to undue discrimination  We can just knock the standing thing out, right? Yes. That's so weak. Turning to the merits, Your Honor. Turning to the merits. First interpretation of Section 3E4 of the Natural Gas Act is entitled to deference, and indeed here is entitled to a high degree of deference because the Congress Would you address the Chenery problem? Your opposing counsel, I think, referred to that four or five times. Burke's orders, both in the authorization order and the rehearing order, address the subject and it was interpreting Section 3E4. Specifically, I would draw your attention to paragraph of the authorization order, paragraph 46, which is at JA 632. This is where the Commission, right before that, sets out the statutory language of Section 3E4. It doesn't explain it. Paragraph 46 doesn't explain anything. It says, as described in more detail below, the venue does not propose to change the terms and conditions of service for BP in this proceeding. That's correct. So what the Commission is saying there is that it's acknowledging that the operational terms and conditions of service at the facility have not changed, and it is signaling that that is the relevant scope of terms and conditions. Signaling? Is that the best you can do, the signal? It doesn't have to show that it was the basis for the decision. FERC was more explicit in the rehearing order at paragraph 14, JA 840, where, again, the Commission is interpreting terms and conditions of service at the facility to, again, be limited to operational terms and conditions, such as nomination, scheduling, and anything that would affect the quality of service. FERC's interpretation of the statute is consistent with its prior order, and the only relevant precedent on this issue is the Co-Point orders. Co-Point Terminal is the only mixed-use, mixed-service facility out there. And so the only relevant precedent that we have is arises from Co-Point. Just back on paragraph 14 again, is that your best paragraph from the rehearing order? With respect to FERC's interpretation of the specific statutory language, yes. FERC's orders do focus more on determining that BP Energy is not a similarly situated customer, but on paragraph 14 of the rehearing order and 46 of the authorization order, is where FERC is indicating... That's a pretty thin read on which the best, fairly important statutory interpretation, which is we're drawing the line, terms and conditions will not encompass turn-back. I think that's what you're saying this says. Correct. We're saying that the commission has found that terms or conditions of service at the facility... And there's no grappling with prior decisions that have suggested, at least, that turn-back gives the term or condition you want to deal with those, because the opposing counsel cited those, too. The case that the opposing counsel cited was the Tennessee gas pipeline, which is inopposite here. Tennessee gas pipeline was a case predated Energy Policy Act of 2005, which codified... Why does that matter, though? It's talking about what term turn-back is, right? It's talking about what turn-back is in the context of a Section 7 open access transportation service, and we are in an entirely different regulatory regime here. The problem, I think, in Tennessee gas is that there was undue discrimination in a term or condition of service. In Tennessee gas, again, you're looking strictly in the NGA Section 7 context, where all aspects of service are regulated by the commission, which is entirely different than service under Section 3. But in that context, in Tennessee gas, the pipeline did... The commission did explain that it has repeatedly held that terms and conditions of service that may never be individually negotiated because of the risk of undue discrimination include provisions that result in a customer receiving different quality of service. They then went on to then noting that a turn-back right is outside of something that would be an operational term or condition service. The commission analyzed in the Section 7 context whether provision of a turn-back right could result in undue discrimination if the customers are similarly situated. Again, we're in a completely different context here. I understand that you're pointing out the context, but it does seem that the language there from Tennessee did suggest that turn-back rights were a negotiated term or condition of service. Did it not say that? Correct, but what it didn't say... It didn't say that. It's saying that, yes, a turn-back right is a contract term. It's something that can be written into the contract. But I would say, I would point to it, Tennessee at... And when Congress comes in and legislates what is a term or condition of service, presumably, and this is putting too much probably into the congressional head here, but it's thinking about the birth precedence on point, or at least there's no reason to assume Congress meant to disturb the category of things covered by the prior precedent when it uses the phrase term or condition of service. I think if Congress was looking at anything, Congress was looking at the precedent in Hackberry LNG, which is where the commission for the first time decided to have a more hands-off approach to the economic regulation for LNG terminals in order to encourage further development of LNG import terminals, which was deemed to be much needed at the time. This whole provision is odd, I think. Odd is probably the wrong word. But there's a transition, right, from open access regime to a more market-based regime. I agree. But there are going to be some losers in that transition, and the losers potentially are the existing customers, right, who are no longer, at least the terminals are the winners because they now have more of an upper hand in the negotiation than they did before under an open access regime, right? And to protect some of the existing customers, this provision is uncertain. To make sure, okay, you can go out and negotiate market deals with new customers, but to the extent you can negotiate market deals with new customers, you have to have the same kind of deal, I guess kind of deal is a loaded term there, but the same kind of deal with the existing customers. Isn't that the basic idea here? No, that would, as you just said. As to certain things. As you just, I would assert that as you just described it, that would just put us back into the NGA Section 7 context where transportation service providers are allowed to negotiate market-based rates, provided that all of the other tariff terms and conditions of service are the same. Here, Section 3 of the Natural Gas Act went beyond just allowing for market-based rates. Market-based rates were already allowed in a Section 7 context. So this is something new, larger, and more deregulated than just simply allowing for market-based rates. So we need to look at it in that context. Which underscores why 717BE4 is so important. This is the provision that's going to offer whatever protection there's going to be for existing customers. This is the provision. And so that's why I'm curious as to why FERC didn't make more clear below that its decision was turning on a careful reading of this provision and a determination that the turn-back agreement was not covered by this provision. I just don't see it anywhere. The best that you can come up with is vague language that signals an intention to treat it differently. But don't we need more than that under General? What FERC did do is determine that the BP Energy and Statoil are not similarly situated customers. FERC recognized and cited precedent for the fact that not all discrimination is undue discrimination and determined here that because the two classes of customers are not similarly situated and because of the protections guaranteed that preserve the same quality of service, that there is no undue discrimination. The big picture of the orders to me was just that BP was a customer under a different regime. And that seems, to Judge Griffith's point, to be inconsistent with the whole point of this paragraph. Now, do you understand? I mean, their main argument is that the commission below just basically said, well, BP's Section 7 and Statoil's Section 3, and therefore they're not similarly situated and therefore there's no undue discrimination. But that would seem to destroy the whole point of this provision if we just accepted that. Now, I take your point that they go on and allude or signal or whatever we want to use other rationales. But the main thing seemed to be they're just differently situated because of the different statutory structures, regulatory structures. No? Well, the commission went on to explain, you know, the impact of being under the different regulatory regimes and noting that the particular guaranteed regulatory rights that a BP Energy as a Section 7 customer has and recognizing those are valuable rights that a Section 3 customer would not have unless they negotiate and presumably pay for. So your response is not only Paragraph 46, but Paragraph 47 and the cases that are cited there. And if you read those cases, then you come to the conclusion that you're talking about, where FERC ultimately says we're not concerned with the fact that in addition to relinquishing Section 3 terminal service, that will also turn back Section 7. So that's consistent with your view that FERC is focusing on operational discrimination. Yes, that's correct. It's succinct. Yes. That's a distinct signal. The commission, like I would, would like to, I think, reserve most of its time and energy on the environmental issues. Let's talk some more on this, which is you were just talking about the change by 2005 Act. In plain language, as best you can, without reference to this provision, what was its mission in this field? In this field was to completely deregulate the LNG contracts between a terminal customer and whoever they may decide to contract for. It was already deregulated some, right? You said that before. Yes, in the sense that if under Section 7, if a terminal operator could demonstrate that it did not have market power, something that was subject to the FERC's review, constant oversight, then they could engage in market-based rate negotiations, just with respect to the economic term. So this Act was designed to? Completely remove LNG terminal service for a finite period of time. There's a sunset provision attached to this. From the traditional Section 7 FERC regulation of transportation service. But then someone got concerned about that, stuck in this paragraph 4. They got concerned about how the practical implications at the facility, how the tankers would come in, scheduling, who got first rate at that pier, if you have two competing tankers, and the commission, and that's where is the area where there could be self-discrimination. Looks to me like someone got concerned about what was happening in the transition, and then someone got concerned in response to the concerns, and then the tail phrase, as all those terms are defined by the commission, was potential saving provision. Do we have any legislative history on how this all came about? No, not that I'm aware of. Other than the fact that it did arise out of Hatchbury. But I don't have a cite to a congressional record. If there are no further questions on the? There may be some legislative history since the 2005 Act. It was a fairly major enactment back then. Yes, there is legislative history on the 2005 Act, but with respect to Section 3E4 and the preceding section, I don't think there's nothing out there. Outside the usual process would be my guess. Maybe something that you're stuck in. But turning to the environmental issues, indirect impacts, upstream natural gas production. So let's just stick with DP for just half a moment. I just need to be clear what your answer is. When FERC says on rehearing, it starts off by saying the fact that BP is arguing the fact that state stat oil has this relinquishing opportunity and BP doesn't is undue discrimination. And the commission's response is simply as discussed above, that while Dominion had no obligation to offer BP an open access, Section 7 customers the same opportunity to turn back terminal service that it offered to its customers, receiving non-open access, Section 3. So the commission really is just sticking with this Section 3, Section 7. And not reading 3E4 to provide any additional protection or the tail that Judge Kavanaugh refers to as providing any additional protection to an existing customer. The commission's orders clearly determine that the BP energy and stat oil are not similarly situated and there is no undue discrimination because they're receiving the same quality of service. So what about the argument that the commission has never told us that the stat oil contract doesn't give them it all the rights that BP has under the regulatory scheme of the Section 7? Again, hypothetically, suppose they were the same. If they were the same, stat oil had to negotiate for all those rights and presumably in arm's length negotiations between two non-affiliated parties that they had to then pay for those rights, rights that were just automatically given to BP Energy or automatically accessible to BP Energy, stat oil would have had to have negotiated, bargained for, and paid for. But that really does collapse at that instant and just they're under a different regime, statutory regime. Because you're saying even the contract gives them exactly the same rights that the regulations give BP. It doesn't matter. That's what I think you just said. That's what I want to be clear about, yeah. I'm saying while the contract, line by line, perhaps the terms read the same, the price would be different. It's reflected. The difference between the two customers are reflected in the price. The price that BP Energy pays is the regulated cost of service price unless it's the market-based thing. And then the price that stat oil pays is the price that it was able to negotiate given all the terms it felt it would have needed in its contract. So we know in the record here that there is a significant price differential. We do not know. The statute is clear that with respect under Section 3E3B, Roman numeral 2, 1, prohibits FERC from conditioning its orders on any aspect of the rates, charges, terms, and conditions of service at the LNG terminal. Congress clearly took it outside of FERC's sphere, these Section 3 contracts. Now I'd like to turn to Judge Rogers' concerns on environmental issues. No questions. That's distinct from concerns. That's just a question. Questions regarding the, thank you. One more on the last issue. What exactly does this section prohibit the media from doing? Section 3E3B prohibits from, in plain English, I would say, interfering with a contract between the terminal operator and its customer. No, the provision that preserves says there's no undue discrimination. 3E4? Yeah. 3E4 protects customers from... Protects existing customers from what? From receiving, from differing terms and conditions at the facility. So differing... What does that encompass though? That encompasses things that would affect the quality of service provided at the facility. Isn't that actually covered under degradation of service, prior clause? Degradation of service to existing customers. I think that they should be read together. I mean, degradation of service, that would be less, yeah, a lesser quality. But I think the latter part, the undue discrimination, it's ensuring that all operational aspects are the same for both classes of customers. Okay. I'm done. Could you address the environmental issues for a minute? I would be happy to. There was a... Judge Rogers, you asked some questions about what the commission's role is as the lead agency for purposes of NEPA. And PERC's role as a lead agency doesn't change the scope of what the commission must consider to fulfill its own NEPA obligation. When I look at this issue, I see a Venn diagram, where PERC has its circle of environmental issues that it must consider for purposes of it authorizing the construction and operation of the terminal. And then there's several other agencies, such as Department of Transportation, Department of Energy, Coast Guard, several other agencies out there that also have their own NEPA obligations with respect to the authorizations that that agency is issuing. And so you draw in the circles, and there's overlapping parts. So what about Council's statement that we learned today, that in Energy's statement, it simply adopted PERC's environmental analysis and did not do any of its own? I think that misrepresents what Department of Energy did. Department of Energy, as a cooperating agency, is required to review before it would adopt the environmental assessment of the lead agency. A cooperating agency, such as Department of Energy, is required to independently review the PERC's environmental assessment and determine whether PERC's environmental assessment satisfies its own needs. And the Department of Energy, in its 2015 order that authorized the export to non-free trade countries, specifically stated that it independently reviewed PERC's environmental assessment and determined that it covered all of the issues that the Department of Energy needed. And even backing up, as a cooperating agency, they are to participate at the earliest possible time in the environmental review process so that they can, through the scoping process, identify issues that they may need to be included in the environmental analysis. And then is supposed to participate and continue along in the process as a joint partner in this. And it does not ultimately change PERC's role with respect to PERC's obligations under NEPA for authorizing the construction and operation of the liquefaction facilities. And the lead agency's responsibilities are set out, as well as the cooperating agency's responsibilities, are set out in the regulation implementing NEPA in several different areas. So let me just be clear. As you know, we've had several cases involving this export facility issue. And my understanding was that given the secretary's decision as to what the secretary would do versus what the commission would do, therefore the commission's responsibility, as you put it, was sort of a narrower concentric circle, that the environmental issues, greenhouse gases, all those sorts of things, beyond the facility itself, or rather beyond the project being constructed itself, was something that ENERGY was going to look at. So council this morning tells us that ENERGY's statement of no significant environmental impact says, well, we're just going to, you know, we're satisfied with what PERC did. We know from the Department of Energy's order, we've had a lengthy environmental review section. The Department of Energy agreed, came to its own independent determination that, like PERC, they agreed that the upstream induced additional production of natural gas were not sufficiently causally related or reasonably foreseeable such that they needed to examine them under NEPA. The Department of Energy did take the additional extra step outside of NEPA of commissioning and producing two reports, the environmental addendum and the greenhouse gas reports, which were very broad, nationwide looks at possible impact. And the Department of Energy itself concluded, with respect to these reports that it developed, that they were still too general to be of use for it for any specific export authorization. All right, so as you know, this FONSI is not in the record, so I haven't seen it. But I'm guessing what you're telling me is it's not a complete recounting of what energy did in the NEPA area. No, not at all. I would encourage the court to look at the Department of Energy's May 2015 order, final order with respect to Code Point and the lengthy environmental section in it where the Department of Energy describes all of the documents and information that it looked at, one of which was the commission's environmental assessment, amongst other things. And then it contains the Department of Energy's analysis and thinking and its ultimate conclusion that, with respect to induced natural gas, that the impacts are just not reasonably foreseeable or sufficiently causally related such that they need to be included in a NEPA document. Just a few other points I wanted to make in response to what Petitioner Earth reports stated. They brought up Constitution Pipeline. And Constitution Pipeline is a project that recently got authorized by the commission, and it's very similar to the pipeline that was reviewed by the Second Circuit in 2012. It's a pipeline that traverses the Marcellus Shale region and then interconnects to other gas, interstate gas pipelines to ultimately take gas to market, particularly the northeast market. And in the 2012 Coalition for Responsible Growth case, the Second Circuit found that with respect to the petitioners urging in that case that the commission needed to look at natural gas production and development activities that they believed were going to be induced by the existence of this new pipeline, the court found that there was not a sufficient causal relationship such that FERC, it warranted further analysis by FERC. And I would say Constitution Pipeline is in lockstep with that. And I would just note that with respect to the FERC's obligation under NEPA, NEPA regulations have instructed FERC to focus on high-quality information and issues that are truly significant to the project. And FERC's environmental assessment here reflects those principles. And here FERC reasonably determined that because of the significant amount of speculation that would be required to estimate potential environmental impacts of upstream production that it just would not provide useful or meaningful information for the commission's determination of whether to authorize the construction and operation of the liquefaction facilities. Is there no further questions? All right. Thank you. All right. Counsel for intervener, Dominion Cove Point. Good morning, Your Honors. Kate Stetson representing Cove Point. I'd like to go briefly once more into the breach on BP and then close with the environmental issues if I could. The first item to report is that there is no legislative history associated with these particular provisions. So that leaves us with the statute and with what FERC said below. Go ahead. Why do you think that is? Oh, I can't even hazard a guess about the legislative history, but I'm actually quite comfortable relying on what we've got. We don't even know the source of the provision. No, we don't. But here's what we do know. Just in terms of what FERC said and how it said it, there are several different elements, of course, to this particular provision. There has to be discrimination, it has to be undue, and it has to pertain to the terms and conditions of service at the facility as defined by the commission. And that is an unusual phrase, and I suggest that it gives the commission a lot of latitude to decide what is and is not a term of condition or condition of service at the facility. So in this very – with respect to this very – I'm sorry to interrupt, but they didn't really do what you just said, and that would be a bit weird to spell out. They didn't rely on, for example, that last clause in explaining, oh, we have lots of authority to define what terms and conditions are, why we think our president is saying this and it's not operative anymore, and just giving us a little bit on this other than a sentence or two. I'm not sure in the end we'd have to decide whether we agree with that, but I don't even see it in the order. Right. I actually think they gave a lot more than that, though, Your Honor. The first is with respect to the two paragraphs that were previously under discussion, which are paragraphs 13 and 14 of the hearing orders, this is Joint Appendix 839. What the Commission first does is essentially turn to the question about whether these two shippers, BP and Statoil, are similarly situated to begin with. And it wasn't some kind of facile distinction just based on the fact that one was Section 3 and the other was Section 7, which would, I think, collapse back onto itself. It was far more specific because what Ferg said is when you are talking about the return of capacity, paying capacity in exchange for an exit fee, BP has protections on account of being a Section 7 shipper that Statoil doesn't have. We don't know. We actually don't know whether they have them by contract, though. No, but the Commission actually deals with that as well. The Commission deals with that as well in that very paragraph. It says that the fact that, you know, there are market conditions that might render this right more or less valuable to BP doesn't really matter. The fact that Statoil could also, I would wager, contract for that doesn't mean anything when what you've got is a statutory guarantee to BP that it can do something with that capacity. That's the distinction. And on top of that, what you have with respect to BP – First of all, I want to make sure my logic is correct here. You don't even need to get to this stuff if terms and conditions doesn't encompass turn back. That's correct, and that's where I was next turning. So with respect to terms and conditions of service at the facility, here is what I would point you to. It's in the joint appendix at page 43. It's paragraph 108 of the Commission's 2006 order, and it's an order pertaining, among other things, to a settlement that Dominion reached with, among others, BP and Statoil. And what that paragraph that I just referred you to, 108, says is, with respect to the general terms and conditions of Section 30 of this particular tariff, we find no undue discrimination as to the terms and conditions of service at the facility. So, yes, can the past be – is the past fledgling? No. But can the past be reasonably discerned? Yes, because if you look at the very last item now – But they wouldn't have needed this in paragraph 13, for example, if they agreed with your main statutory argument. And they don't say, okay, the statute just has no application here. And even if it did, in the alternative, you know, how you would structure something like that. That's not really how this – Paragraph – that's talking about subsidization and degradation. At the very end of that paragraph – are you looking at 108? Yeah, that's right. Page 43. At the very end of paragraph 108, there's a statement about – LG's existing customers or undue discrimination against existing customers. But, I mean, it's just a conclusion. It doesn't explain. That's correct. But the fact is what it's talking about there is as to the terms and conditions of service. Those terms and conditions of service are those that are captured in Section 30 of those general terms and conditions. And to your point, Judge Kavanaugh, I think it was just a question of ordering. What the Commission chose to address first in its rehearing order was whether there was discrimination. But on Paragraph 14, pertaining to your question, what it says is the terminal service that it receives from Dominion – EP receives – is fundamentally the same as that provided to Federal. Federal receives no preference in nominating, scheduling, or the quality of the terminal service provided. That is the kicker as far as terms and conditions of service is concerned. So the Commission chose to deal with discrimination first and terms and conditions second. I could equally hint on it the other way around. But I think with respect to both of those points, the Commission's path is pretty clear. You asked a question also of Ms. Larson regarding what is essentially undue discrimination. Here would be an example. If Dominion were to have a contract with Staple and subsequently contract with BP, and in that subsequent contract with BP say, you know, we like you. We're going to let you come first to our docks. We're going to let you have first preference every time and when you unload or load your LNG. We're going to let you nominate your capacity with not as much paperwork requirement. We're going to let you give special treatment to your particular vessels. All of that is a term and condition of service at the facility. That's what they can't do. What we're talking about here is an exit fee, money for capacity. That's an economic term, and it's not subject to this. So if I could have... Isn't that already prohibited, though, even without this provision? In other words, wouldn't that be undue discrimination under some other provision? No. This is giving something special. You don't think it's covered by any other provision? No, it's not because this goes directly to Section 3 service. In fact, I think the opposite of your point is true, which is if this provision is read the way that BP would like it to be read, it's an exact match for Section 4 and Section 5, which are the discrimination provisions later in Section 717 that go into shall not discriminate in any way as to any term or in any other respect, et cetera, et cetera. But this provision doesn't prohibit discrimination against new customers.  It prevents discrimination against... Your hypo was discrimination against a new customer, I think. No, I was only flipping the plot. I was saying favoritism toward a new customer and discrimination... Favoritism towards an existing customer is permissible under this provision. I was wondering if there's some other provision that would... No. The hypothetical that I gave was discrimination against one who was already a customer by someone coming in and getting a more favorable term or more favorable arrangements with respect to loading or unloading and so forth. So it has to be that kind of operational for the term that you just said. Exactly. And you can find all of the root of that in this case with respect to this very tariff provision in the joint appendix at the very end, the last document in Volume 2 of the JA specifies what these terms and conditions of service are in some detail. So with respect to the environmental issues, if I could just make one or two points. The overarching point is this. EARTH reports in this case is attempting to have NEPA do something that NEPA isn't designed to do. That is why I think there is the struggle with who is responsible for what, what effects are upstream, what effects are downstream. NEPA asks the question, what effects are caused by this action that you are proposing? Not what effects are associated with it, not what effects are happening elsewhere in the industry. What is this facility going to cause in the way of environmental effects? And the Commission spent over 200 pages examining and answering that question. NEPA is not some kind of a policymaking statute. It doesn't ask for a referendum about national natural gas policy. I take their point to be a little different and a little more subtle, and I think you understand that. You can write 215 pages, but if you leave out the key analysis, it's really not worth anything. And their position is that, and since I keep sitting on these cases, that every time there's a new project, FERC says no causation, cites public citizens, end of discussion. So the question that the environmental groups keep raising is, well, you look at all that's going on, there has to be some cause and effect. It's not as though we're just planting flowers. Judge Rogers, I actually think that's faulty logic for a couple different reasons. The first is, with respect to causation, what the Commission actually found in this case, with respect to this facility, and this is a finding that is of considerable deference, is that this facility did not cause anything to happen in the Marcellus Shale. The Marcellus Shale and its capacity was discovered back in the early 2000s. There was no cause that this facility is producing something in the Marcellus Shale. That's not how it works. That was the finding. Same with foreseeability. What the Commission found, again, in its finding entitled to deference, is that nothing in the operation of this single liquefaction train in Maryland is going to have a foreseeable effect on upstream or downstream consumption. It just can't be foreseen. Now, what you heard today is something actually a little bit different that I have never heard before, and I attempted to look back in my brief while others were talking. What you heard today was the concept of segmentation. That is not something that Earth Reports ever argued. And with respect to segmentation, this is no more segmentation than it was segmentation for the Motor Carrier Safety Administration to approve safety of trucks and for the President to approve whether the trucks got to drive across the border. That's not segmentation either, and neither is this. FERC found in this case insufficient causation and insufficient foreseeability. It based it on its assessment of what was available to it at the time. What DOE now has done, just to sharpen the point that Ms. Larson also made, is that it took FERC's findings of no causation and no foreseeability. It agreed with them. It need not have, but it did. But what it also did is to say, look, I know that this issue is of policy concern. This isn't the place for it in a NEPA analysis, but as to that policy concern, we're going to look at the Environmental Addendum and the Greenhouse Gas Report. We're going to see what they say. To the extent that they gave something useful with respect to the public interest question, that is DOE's charge, we'll take a look at it. And that addendum and the report are included in DOE's papers. That doesn't mean that FERC's analysis was faulty. FERC confined itself to the NEPA question that was in front of it, which is what environmental effects are this facility going to cause? And it found no causation and no foreseeability. I submit those were entitled to deference. And if there are no questions on that, I will leave it there. Thank you. Thank you. All right, Council, Brandon Wiener, API. Good morning. Ben Norris for the American Petroleum Institute. I'd like to pick up on Ms. Stetson's last point regarding causation and simply underscore not only is there sort of a lack of foreseeability in terms of where upstream impacts might be seen to be caused by a single liquefaction train in Maryland, but as we briefed for the Court, the arrow of causation that petitioners attempt to point you to is exactly in the other direction, that not only is this a phenomenon in the natural gas markets in the Marcellus Shale in Pennsylvania, Ohio, and West Virginia, but is indeed a nationwide phenomenon that predates the authorization of the construction of this facility by about a decade. And the fact that this gas is being produced really all over the United States and will feed the liquefaction train at the Cove Point facility is borne out in the EA prepared by the FERC, in which they say that natural gas will come from anywhere. And presumably they're thinking specifically about the three interconnected major natural gas pipelines that go into the facility. I'd like to also just briefly touch on some of the arguments raised with respect to the Constitution pipeline proceeding, some of the environmental impacts you heard about regarding water withdrawals, well construction, and truck traffic. Understand, as we also talk about in our brief, that these impacts are already regulated not just at the state level, not just at the interstate level, but at the federal level. Impacts related to well drilling and construction are regulated, if we're looking just in Susquehanna County, Pennsylvania, by the Pennsylvania Department of Environmental Protection. Water withdrawals from the Susquehanna River are regulated by the Interstate Susquehanna River Basin Commission, and air emissions from the construction and drilling of these wells are regulated by the United States EPA. The very last point that I'd like to make on environmental impacts is related to the issue raised by petitioners regarding studies that foresee a 60% to 80% increase in natural gas production. Understand that I believe the study referred to by petitioners is a 2014 EIA study, which examined an export scenario for LNG of 20 billion cubic feet a day. We are talking about a fraction of that amount in the context of the Coat Point facility, and I think it's also worth pointing out that even if the Department of Energy prepares a study like this, outside of the NEPA process, that says nothing about the foreseeability of either upstream or downstream impacts. Thank you. Thank you. All right. Counsel for petitioner? Petitioner, Earth Reports. Thank you, Your Honor. I'd like to begin with a point I think we agree with the respondents. We agree that the question in this case is what effect will this project cause? They are arguing that there's no causality because even though this project is going to export 1 billion cubic feet per day, it's going to have absolutely no effect whatsoever on supply. The whole purpose of this project is to liquefy gas for export. There isn't a shred of evidence in the record, and it is FERC's burden to provide a convincing case for its funding, that the effects of this project will be exactly the same regardless of whether it goes into place. Indeed, FERC cannot say that there is a need for the project that will not be satisfied by an election alternative and then turn around and say that the facility will make no difference. This is a 20-year facility. It is true. There is a glut of gas in the Marcellus Shale, and there may be a few years' worth of gas backed up that could be sent to Coast Point. We are not arguing that every drop of gas is induced by this project, but all of the evidence in the record suggests that approximately 60 percent of it will be induced by this project and, moreover, that it is predictable where it's going to be and what the impacts will be. The FERC and Constitution Pipeline case, which we cited in the pages from the addendum, was able to predict what the impacts would be based on the volume of gas. They looked only at the land use, but you can predict a wide range of impacts beyond the land use as long as you know how much gas is going to be used. We know how much gas will be used. Moreover, FERC itself, in the Jordan Cove case, did a downstream combustion analysis. Now, if it can do it in the Constitution Pipeline case, it can do it here. If it can do it in the Jordan Cove case, it can do it here, and it must do it here under NEPA because this facility is the crucial link between the upstream development that will be induced by this project and the downstream shipping and combustion that will not occur unless this project goes forward. Finally, as a public citizen, public citizen does not really apply in this case because public citizen held that an action could not be considered a legally relevant cause if the agency could not prevent the effect. FERC can prevent the effect. FERC can deny this project. FERC has denied LNG terminal projects in the past. If it denies the project, all of the upstream impacts, all of the downstream impacts, will not happen, nor will the direct impacts. And I want, again, to focus the Court's attention one more time on the direct impacts. The direct greenhouse gas impacts of this project are the equivalent of the fourth largest industrial facility in Maryland. There is nothing in the record that explains why that is not a significant impact, and it is FERC's burden to review that. It is FERC's burden to explain why there is no significant impact in this case in context. That's what NEPA requires. Significant determination requires consideration of context. And in the Maryland context, this is enormous. We are not asking the FERC here to do anything extraordinary. This is what EPA has been asking it to do. This is what CEQ recommends that it does. This is what other agencies are doing. There are state agencies, even, that are doing full life cycle greenhouse gas impact analyses. FERC can do it if it will use the tools that are available to it, and it will pay attention to the facts that are presented before it. It can't simply throw up its hands and say, it's just too hard for us. We just can't figure it out. The modeling tools are out there. We have spoon-fed them the resources that will show exactly where these wells are going to be drilled. We have a map of where the capitol wells are going to be drilled. FERC cannot turn a blind eye to the evidence before it and refuse to acknowledge that if it has any doubts about it, it is FERC's obligation to clarify that under the CEQ records. It cannot simply claim that it doesn't have information. It must, unless it is exorbitantly expensive, collect the information. And what's more, that is what an EIS is for. If there are concerns about lacking information that it can find in a reasonable way, which it plainly can since it's done it before the Constitution and Jordan Codes, then it must go out and get that information. It has absolutely refused to do anything of the sort. It has sat back on its heels and told us that it's just completely impossible to predict. So in conclusion, Your Honor, we would ask this Court to vacate the decision of the agency and to remand this proceeding to the Commission for preparation of an environmental impact statement that examines the full direct and indirect impacts of the project, including the impact on the people who have to live through intensive shale gas development. And this is extremely intensive new development. We're talking about 3,000 wells. Three thousand wells in Susquehanna County is more than three times the number of wells that were developed between 2009 and 2014. And all of that gas has to be ready on day one to ship. And certainly the information about that would be important to consider in any balancing of benefits and costs in this case. All right. I think we have your argument. Counsel for Petitioner BP Energy. Thank you, Your Honor. I'd like to first address Clark's contention that they interpreted the phrase terms or conditions of service with the ability to exclude turn-back provisions in the orders below. And, Your Honor, it is simply not that court in the order. They point to Section 46 of the initial order in the statement that the turn-back did not change the terms and conditions of service for BP. That is simply a way of saying that there is no degradation of service. It doesn't change the terms or conditions of service for BP. What about 14 of the rehearing order? That seems to be the best. 14 of the rehearing order, Your Honor, they state that there will be no discrimination in the critical tariff areas such as nominations and scheduling as well as… BP acknowledges the terminal service that it receives from Dominion is fundamentally the same as that provided the Statoil. Statoil receives no preference in nominating, scheduling, or the quality of the terminal service provided. Yes, Your Honor. So if you kind of put that up against the light, you can see them saying, I think, this is the argument. I'm not sure I agree with this. They say you can see them saying the statute doesn't cover things outside the bounds of discrimination in nominating, scheduling, or the quality of the terminal service provided. Well, that is the argument they have made in this appeal, Your Honor. But that is certainly a great deal to try and unravel from that sentence, which simply says that BP has fundamentally the same terminal service from Statoil, and it offers no explanation as to why it would not also, likewise, be undue discrimination for Statoil to receive a preferential turn back. And now they say it's because it's simply not within the meaning of the statute at all. But that sentence doesn't say anything about the meaning of the statute, much less purport to offer a definition of the phrase terms or conditions of service. And if you look a couple pages back, Your Honor. But you agree, would you not, that the commission is responding to the petition for rehearing? Yes, Your Honor. All right. So it's addressing its interpretation. Well, Your Honor, it's a response to the argument that a holding that Statoil and BP are not similarly situated would render the provision effectively meaningless. And they say, well, it wouldn't render the provision meaningless because you still have the protections that are contained in Section 30 of the tariff, which provides you certain protections, such as in nominating and scheduling. But there isn't an explanation there. In the operating condition. That's the nomination, scheduling, and operating conditions. So they pointed to that, too, to turn to that sentence as being a further indication that they're drawing the line in the statute. And, again, this phrase is important to me, I think, as all of those terms are defined by the commission. And, again, this is not as clear as it could be. I agree with that. But they do seem to be suggesting nomination, scheduling, and operating conditions are terms covered and everything else is not. Well, Your Honor, I think that sentence actually is inconsistent with the interpretation that they've advanced here, that terms and conditions of service simply refers to operational terms and conditions because it states that what's required to be protected is terms and conditions of service in critical tariff areas. And then they give three examples. Yeah, such as. Such as. Such as helps you. I agree. And one of those is operating conditions. So that sentence clearly is referring to terms and conditions of service protected as being something broader than simply operating conditions. And if you look on page 838 of the rehearing order, that is where FERC actually explains what it believes it held in its initial order, and that's at the bottom of paragraph 10. And they state, the September 29th order found that BP and SPATOIL were not similarly situated for the purposes of relinquishing terminal service because SPATOIL was an expansion customer receiving non-open access service under Section 3, while BP was an LTD1 shipper receiving open access terminal service under Section 7. All right. So go to the next paragraph. No, I'm serious about that. Yes, your Honor. It says, on rehearing, BP renews its argument contending that the two were similarly situated customers because, and FERC responds in there and the next couple of paragraphs. I mean, you may not agree with it, but isn't that what the agency is doing here? They are responding, yes, your Honor. And again, they respond that they reaffirm their holding, this is the bottom of paragraph 13 on JAE39, that Section 3 and Section 7 terminal services are distinguishable and the conclusion that BP and SPATOIL are not similarly situated. And then it goes on in 14 to talk about the terminal service is fundamentally the same. Yes, your Honor. It does state that, but what is missing from there is the interpretation of the statute that they now need to make. I'm sorry to interrupt. Isn't that reasonably discernible, the path reasonably discernible there, that they wouldn't be talking about those things unless that were the premise of their discussion there, namely that the statute allows discrimination and things outside the fields of nominating, scheduling, quality of terminal service, operating conditions? Well, your Honor, I think you can fairly discern... Because otherwise this discussion doesn't make sense, right? Well, you can fairly discern that they thought it had some relevance to the question at hand, but what it... But am I right that this discussion doesn't make sense unless their premise was that the statute is going to be interpreted not to apply outside the bounds of nominating, scheduling? Well, no, your Honor. It could be relevant in any different number of ways, none of which are explained. And as your Honor addressed earlier, in fact, there's no explanation for why they would have that lengthy discussion of whether stat oil and BP are similarly situated. It is, in fact, they were holding that turn back was not a term or condition of service at all. I mean, paragraph 13 would be entirely unnecessary. Yes, your Honor. It would be entirely superfluous. And they could be saying, for instance, in paragraph 14, that there is discrimination, but no discrimination would be undue because the turn back services simply aren't as important as nominating, scheduling, and operating conditions. Do you agree that in paragraph 11, J.A. 838, the commission accurately summarizes the arguments that BP presented in seeking rehearing? I believe so, yes, your Honor. And my only comment is what argument hasn't the agency responded to? I understand they could have written it differently, but what argument didn't they respond to? Well, it's not so much, your Honor, that they didn't respond to BP. But it is, isn't it? Because it's your client's burden on rehearing to tell FERC why it's wrong in its previous order. And then FERC's responsibility is to give us the answers to your objection. Yes, your Honor. And our argument on rehearing was essentially you can't rely simply on the fact that BP is an open access customer, while Statoil is not, because the statute is clearly intended to prohibit discrimination against open access customers in favor of non-open access customers. So they respond to that argument in the rehearing order, your Honor, but the response is contrary to the statute. So could your argument succeed even if, so far as FERC has identified a meaning for undue discrimination, that may be an interpretation to which the court should defer, but it doesn't necessarily mean that it has exhausted the meaning of the statutory phrase, ignoring for the moment the tail that we discussed earlier? Well, your Honor, the only interpretation that is offered in the orders below is the interpretation that Dominion, that Statoil and BP are not similarly situated due to the difference in the regulatory regime. And that is not an interpretation that this court can defer to, because it is clear from the statutory text itself that the statute is intended to prohibit discrimination. Suppose they said in the order, exercising our authority to define the terms covered, we conclude that the only terms covered are nominating, scheduling, quality of terminal service and operating conditions. Let's just suppose they said that, okay? They would be wrong as a matter of law because... They would be wrong as a matter of law, first of all, because the statute doesn't draw that distinction. It refers generally to terms and conditions of service at the facility and... As all of those terms are defined by the commission. So they say we hereby define those terms to mean four things I just read. Yes, Your Honor, if they had done that, that would be a very different matter for us. However, we still think in light of the statute's use of the broad phrase and in light of the broad purpose to prevent abuses of market power from harming existing open access customers, to draw such a narrow definition may still be unreasonable, particularly if done without any explanation. Well, in your broad purpose, I just don't know how we could take that out and put that into this provision. It seems to be the best way to figure out this provision is just stick with the terms of it rather than trying to superimpose the broader purpose on it. Because this provision quite clearly is a double compromise. Well, Your Honor, to be clear, we don't believe the court should address this interpretation at all under the Shannery rule because it's not the basis for the orders below, and therefore the agency can't raise it. That's a good argument. If they're going to do something that's important, they shouldn't do it by a bank shot. That's a fair argument. Yes, Your Honor. All right. All right. We'll take them under the guise.
judges: Rogers, Griffith, Kavanaugh